IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| JUAN A. RIVERA, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12 C |
| v. | ) | |
| | ) | |
| LAKE COUNTY, Illinois, LUCIAN | ) | |
| TESSMAN, CHARLES FAGAN, MICHAEL | ) | |
| MALEY, DONALD MEADIE, MICHAEL | ) | |
| BLAZINCIC, JAMES HELD, FERNANDO | ) | |
| SHIPLEY, HOWARD PRATT, RICHARD | ) | |
| DAVIS, DAVID OSTERTAG, JAMES | ) | |
| GENTILCORE, PHILLIP STEVENSON, | ) | |
| ROBERT BOONE, GARY DEL RE, | ) | |
| ESTATE OF CLINTON GRINNELL, MARK | ) | |
| CURRAN, Lake County Sheriff, in his | ) | |
| official capacity, CITY OF WAUKEGAN, | ) | |
| CITY OF LAKE FOREST, VILLAGE OF | ) | |
| BUFFALO GROVE, LAKE COUNTY | ) | |
| MAJOR CRIMES TASK FORCE, | ) | |
| UNKNOWN POLICE OFFICERS, | ) | |
| UNKNOWN MUNICIPALITIES OF THE | ) | |
| LAKE COUNTY MAJOR CRIMES TASK | ) | |
| FORCE, JOHN REID & ASSOCIATES, | ) | |
| INC., MICHAEL MASOKAS, UNKNOWN | ) | |
| EMPLOYEES OF JOHN REID & | ) | |
| ASSOCIATES, MICHAEL WALLER, | ) | |
| JEFFREY PAVLETIC, MATTHEW | ) | |
| CHANCEY, STEVEN McCOLLUM, and | ) | |
| MICHAEL MERMEL, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

## COMPLAINT

NOW COMES Plaintiff, JUAN A. RIVERA, JR., by his attorneys LOEVY & LOEVY

and the RODERICK MACARTHUR JUSTICE CENTER, and complaining of Defendants

LAKE COUNTY, Illinois, LUCIAN TESSMAN, CHARLES FAGAN, MICHAEL MALEY,

DONALD MEADIE, MICHAEL BLAZINCIC, JAMES HELD, FERNANDO SHIPLEY,

HOWARD PRATT, RICHARD DAVIS, DAVID OSTERTAG, JAMES GENTILCORE, PHILIP STEVENSON, ROBERT BOONE, GARY DEL RE, ESTATE OF CLINTON GRINNELL, MARK CURRAN, Lake County Sheriff, in his official capacity, CITY OF WAUKEGAN, CITY OF LAKE FOREST, VILLAGE OF BUFFALO GROVE, the LAKE COUNTY MAJOR CRIMES TASK FORCE, UNKNOWN POLICE OFFICERS, UNKNOWN MUNICIPALITIES OF THE LAKE COUNTY MAJOR CRIMES TASK FORCE, JOHN REID & ASSOCIATES, INC., MICHAEL MASOKAS, UNKNOWN EMPLOYEES OF JOHN REID & ASSOCIATES, MICHAEL WALLER, JEFFREY PAVLETIC, MATTHEW CHANCEY, STEVEN McCOLLUM, and MICHAEL MERMEL states as follows:

## INTRODUCTION

1.      Plaintiff Juan Rivera was wrongfully convicted of the brutal rape and murder of an 11-year-old girl named Holly Staker. The crime occurred in Waukegan, Illinois, in 1992.

2.      Plaintiff did not commit the crime and there was not one piece of physical evidence connecting him to the killing. The evidence that tied Plaintiff to the Staker murder was a false confession concocted and coerced by the Defendants over the course of four days of intensive and abusive interrogation.

3.      So abusive was the Defendants' interrogation that Plaintiff suffered a psychological breakdown during the third night of questioning. As he was experiencing this mental collapse, the Defendants "hog tied" Plaintiff and placed him in a padded room. Medical personnel who observed Plaintiff soon thereafter diagnosed him with acute psychosis and observed that he had torn out pieces of his scalp. Nevertheless, the Defendants continued to interrogate Plaintiff, and they claimed that, in the midst of this psychological break and on the fourth day of their interrogation, Plaintiff confessed to killing Holly Staker.

4. Plaintiff's "confession" was demonstrably false. Ample evidence, including an electronic monitoring system that tracked Plaintiff's every move at the time, established that Plaintiff had been at home during the murder and could not have been involved.

5. Nonetheless, based on the force of Plaintiff's coerced confession and the Defendants' false statements that Plaintiff had confessed voluntarily and without being fed details of the crime, Plaintiff was wrongfully convicted. He was sentenced to life in prison without parole, having narrowly avoided the death penalty.

6. Following Plaintiff's conviction, new DNA testing of semen found inside of the victim excluded Plaintiff and showed that a different man had raped and killed Holly Staker. After 20 years of wrongful incarceration, the Illinois Appellate Court reversed Plaintiff's conviction, finding that no rational jury could ever find him guilty, and entered judgment of acquittal in his favor. The State declined to appeal.

7. On January 6, 2012, Plaintiff walked out of prison a free man, having served half of his life behind bars for a crime he did not commit.

8. Plaintiff now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that Plaintiff has endured and continues to suffer as a result of the Defendants' misconduct.

## JURISDICTION AND VENUE

9. This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

10. This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

11.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district, the majority of the Defendants reside in this judicial district, and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

## PARTIES

12.     Plaintiff Juan Rivera is a Latino man who spent 20 years in prison for a crime he did not commit.

13.     Defendants Lucian Tessman, Donald Meadie, Fernando Shipley, Howard Pratt, and Richard Davis are former officers of the Waukegan Police Department and the Lake County Major Crimes Task Force.

14.     Defendants Charles Fagan and Michael Blazincic are former officers of the Lake County Sheriff's Department and the Lake County Major Crimes Task Force.

15.     Defendants Michael Maley and James Gentilcore are former officers of the Illinois State Police and the Lake County Major Crimes Task Force.

16.     Defendant James Held is the current Chief of Police of the Lake Forest Police Department and a former officer of the Lake Forest Police Department and the Lake County Major Crimes Task Force.

17.     Defendant David Ostertag is a former officer of the Waukegan Police Department and the Lake County Major Crimes Task Force and a former investigator for the Lake County State's Attorney's Office.

18.     Defendant Phillip Stevenson is the former Police Chief of the Waukegan Police Department and a former member of the Lake County Major Crimes Task Force. Defendant Stevenson was responsible for supervising officers of the Waukegan Police Department and the Lake County Major Crimes Task Force.

19.     Defendant Robert Boone is the former Police Chief of the Lake Forest Police Department and a former member of the Lake County Major Crimes Task Force. Defendant Boone was responsible for supervising officers of the Lake Forest Police Department and the Lake County Major Crimes Task Force.

20.     Defendant Gary Del Re is a former officer of the Buffalo Grove Police Department, a former commander of the Lake County Major Crimes Task Force, and a former Sheriff of Lake County. Defendant Del Re was responsible for supervising officers of the Buffalo Grove Police Department, the Lake County Sheriff's Department, and the Lake County Major Crimes Task Force.

21.     Defendant Estate of Clinton Grinnell (hereinafter "Defendant Grinnell") is joined as the successor in interest to Clinton Grinnell, who is the former Sheriff of Lake County and a former officer of the Lake County Sheriff's Department and the Lake County Major Crimes Task Force. Grinnell was responsible for supervising officers of the Lake County Sheriff's Department and the Lake County Major Crimes Task Force.

22.     Defendant Mark Curran is the current Sheriff of Lake County, Illinois. He is sued in his official capacity. As Sheriff, Defendant Curran oversees the Lake County Sheriff's Department, which was the employer of Defendants Fagan, Blazincic, Del Re, Grinnell, and Unknown Police Officers of the Lake County Sheriff's Department. In addition, each of the other Police Officer Defendants acted as an agent of the Lake County Sheriff's Department while conducting investigations with the Lake County Major Crimes Task Force. The Lake County Sheriff is liable for all torts committed by the Police Officer Defendants while employed by the Lake County Sheriff's Department and the Lake County Major Crimes Task Force pursuant to the doctrine of *respondeat superior*. The Lake County Sheriff is additionally responsible for the

policies and practices of the Lake County Sheriff's Department and the Lake County Major Crimes Task Force.

23.     Defendant Lake County is a county of the State of Illinois, which oversees the Lake County Sheriff's Department. Lake County is obligated by Illinois statute to pay any judgment entered against Defendant Curran in his official capacity. In addition, each of the other Police Officer Defendants acted as an agent of Lake County while conducting investigations with the Lake County Major Crimes Task Force. Lake County is liable for all torts committed by the Police Officer Defendants while employed by the Lake County Major Crimes Task Force pursuant to the doctrine of *respondeat superior*. Lake County is additionally responsible for the policies and practices of Lake County, the Lake County Sheriff's Department, and the Lake County Major Crimes Task Force.

24.     Defendant City of Waukegan is an Illinois municipal corporation that is or was the employer of Defendants Tessman, Meadie, Shipley, Davis, Ostertag, Pratt, Stevenson, and Unknown Police Officers of the Waukegan Police Department. In addition, each of the other Police Officer Defendants acted as an agent of the City of Waukegan while conducting investigations with the Lake County Major Crimes Task Force. The City of Waukegan is liable for all torts committed by the Police Officer Defendants while employed by the City of Waukegan and the Lake County Major Crimes Task Force pursuant to the doctrine of *respondeat superior*. Defendant City of Waukegan is additionally responsible for the policies and practices of the Waukegan Police Department and the Lake County Major Crimes Task Force.

25.     Defendant City of Lake Forest is an Illinois municipal corporation that is or was the employer of Defendants Held, Boone, and Unknown Police Officers of the Lake Forest Police Department. In addition, each of the other Police Officer Defendants acted as an agent of

the City of Lake Forest while conducting investigations with the Lake County Major Crimes Task Force. The City of Lake Forest is liable for all torts committed by the Police Officer Defendants while employed by the City of Lake Forest and the Lake County Major Crimes Task Force pursuant to the doctrine of *respondeat superior*. Defendant City of Lake Forest is additionally responsible for the policies and practices of the Lake Forest Police Department and the Lake County Major Crimes Task Force.

26.     Defendant Village of Buffalo Grove is an Illinois municipal corporation that is or was the employer of Defendants Gary Del Re and Unknown Police Officers of the Buffalo Grove Police Department. In addition, each of the other Police Officer Defendants acted as an agent of the Village of Buffalo Grove while conducting investigations with the Lake County Major Crimes Task Force. The Village of Buffalo Grove is liable for all torts committed by the Police Officer Defendants while employed by the Village of Buffalo Grove and the Lake County Major Crimes Task Force pursuant to the doctrine of *respondeat superior*. Defendant Village of Buffalo Grove is additionally responsible for the policies and practices of the Buffalo Grove Police Department and the Lake County Major Crimes Task Force.

27.     Defendants Unknown Municipalities of the Lake County Major Crimes Task Force formed, constituted, or provided resources or officers to the Lake County Major Crimes Task Force. These Unknown Municipalities of the Lake County Major Crimes Task Force are all Illinois municipal corporations that were or are the employers of police officers who were employees, members, and agents of the Lake County Major Crimes Task Force. In addition, each of the Police Officer Defendants acted as agents of the Unknown Municipalities of the Lake County Major Crimes Task Force while conducting investigations with the Lake County Major Crimes Task Force. The Unknown Municipalities of the Lake County Major Crimes Task Force

7

are liable for all torts committed by the Police Officer Defendants while employed by the Lake County Major Crimes Task Force pursuant to the doctrine of *respondeat superior*. The Unknown Municipalities of the Lake County Major Crimes Task Force are additionally responsible for the policies and practices of the Lake County Major Crimes Task Force.

28.     On information and belief, Defendant Lake County Major Crimes Task Force is an inter-agency law-enforcement organization formed in or around February 1992 by, *inter alia*, the Lake County Sheriff's Office, the Lake County Chiefs of Police Association, the Lake County State's Attorney's Office, Defendants City of Waukegan, City of Lake Forest, Village of Buffalo Grove, and Unknown Municipalities of the Lake County Major Crimes Task Force. At all times relevant to the events described in this Complaint, the Lake County Major Crimes Task Force investigated certain crimes that occurred in Lake County, Illinois. In this capacity, the Lake County Major Crimes Task Force was and is an extension of Lake County, the Lake County Sheriff's Department, the City of Waukegan, the City of Lake Forest, the Village of Buffalo Grove, and the Unknown Municipalities of the Lake County Major Crimes Task Force. The Lake County Major Crimes Task Force is and was governed by officials of these offices, agencies, and municipalities, who acted at all times as policymakers for the Lake County Major Crimes Task Force. In addition, these offices, agencies, and municipalities each provided training, facilities, and equipment to the officers of the Lake County Major Crimes Task Force. The Lake County Major Crimes Task Force is or was the employer of Defendants Tessman, Fagan, Maley, Meadie, Blazincic, Held, Shipley, Pratt, Davis, Ostertag, Gentilcore, Stevenson, Boone, Del Re, and Grinnell. Defendant Lake County Major Crimes Task Force is liable, by Lake County, the Lake County Sheriff's Department, the City of Waukegan, the City of Lake Forest, the Village of Buffalo Grove, and the Unknown Municipalities of the Lake County Major

Crimes Task Force, for all torts committed by the Police Officer Defendants while employed by the Lake County Major Crimes Task Force pursuant to the doctrine of *respondeat superior*. Defendant Lake County Major Crimes Task Force is additionally responsible for the policies and practices of that organization.

29.     Defendant Unknown Police Officers of the Lake County Major Crimes Task Force, Unknown Police Officers of the Lake County Sheriff's Department, Unknown Police Officers of the Waukegan Police Department, Unknown Police Officers of the Lake Forest Police Department, Unknown Police Officers of the Buffalo Grove Police Department, Unknown Police Officers of the Illinois State Police, and Unknown Police Officers of Unknown Law Enforcement Agencies participated in the misconduct alleged in this Complaint (collectively "Unknown Police Officers"). At all times relevant to the events described in this Complaint, these Unknown Police Officers were acting under color of law and within the scope of their employment with their respective law enforcement agencies and the Lake County Major Crimes Task Force.

30.     Defendant John Reid & Associates, Inc., is a for-profit Illinois corporation with its principal place of business at 250 South Wacker Drive, Chicago, Illinois 60606. At all times relevant to the events described in this Complaint, Defendant John Reid & Associates reached agreements to provide the Lake County Major Crimes Task Force and its constituent law enforcement agencies and officers with training, advice, and consultation in connection with the interrogation of individuals suspected of criminal activity. Defendant John Reid & Associates, in fact, routinely provided that training, advice, and consultation pursuant to those agreements. In addition Defendant John Reid & Associates and its employees and agents conducted, participated in, collaborated with, and encouraged the interrogation of individuals suspected of

criminal activity by the Lake County Major Crimes Task Force, its constituent law enforcement agencies, and its officers. Many interrogations, including that at issue in this Complaint, occurred in whole or in part at the Chicago office of Defendant John Reid & Associates, and employees of Defendant John Reid & Associates, including Defendant Michael Masokas and Unknown Employees of John Reid & Associates, participated in investigations alongside officers of the Lake County Major Crimes Task Force. The Lake County Major Crimes Task Force and its constituent law-enforcement agencies and officers regularly delegated to Defendant John Reid & Associates and its employees the responsibilities of interrogating, testing, and eliciting testimony from persons suspected of criminal activity. Defendant John Reid & Associates is liable for all torts committed by its employees pursuant to the doctrine of *respondeat superior*.

31.     Defendant Michael Masokas is the Director of the Services Division of John Reid & Associates. At all times relevant to the events described in this Complaint, Defendant Masokas was an employee of Defendant John Reid & Associates who directed, conducted, and participated in the police interrogation of Plaintiff and the investigation conducted by the Lake County Major Crimes Task Force. As such, Defendant Masokas was acting at all times under color of law and within the scope of his employment with John Reid & Associates.

32.     Defendant Unknown Employees of John Reid & Associates participated in the misconduct alleged in this Complaint. At all times relevant to the events described in this Complaint, these Unknown Employees of John Reid & Associates directed, conducted, and participated in the police interrogation of Plaintiff and the investigation conducted by the Lake County Major Crimes Task Force. As such, Defendant Unknown Employees of John Reid & Associates were acting at all times under color of law and within the scope of their employment with John Reid & Associates.

10

33.     Defendants Tessman, Fagan, Maley, Meadie, Blazincic, Held, Shipley, Pratt, Davis, Ostertag, Gentilcore, Stevenson, Boone, Del Re, Grinnell, Masokas, Unknown Police Officers, and Unknown Employees of John Reid & Associates are referred to collectively as the "Police Officer Defendants" throughout this Complaint.

34.     Defendant Michael Waller is the State's Attorney of Lake County and a member of the Lake County Major Crimes Task Force.

35.     Defendant Jeffrey Pavletic is Chief Deputy State's Attorney for the Lake County State's Attorney's Office and a member of the Lake County Major Crimes Task Force.

36.     Defendant Steven McCollum is a former Chief Deputy State's Attorney for the Lake County State's Attorney's Office and a former member of the Lake County Major Crimes Task Force.

37.     Defendants Matthew Chancey and Michael Mermel are former Assistant State's Attorneys for the Lake County State's Attorney's Office and former members of the Lake County Major Crimes Task Force.

38.     Defendants Waller, Pavletic, Chancey, McCollum, and Mermel are referred to collectively as the "Prosecutor Defendants" throughout this Complaint.

39.     With the exception of the defamation of Plaintiff by Defendants Tessman, Maley, and Mermel, described below, each of the individual Defendants acted under color of law and within the scope of his employment. Each of the individual Defendants is sued in his individual capacity unless otherwise noted.

## FACTS

### The Rape and Murder of Holly Staker

40.     Holly Staker and her twin sister Heather Staker were 11 years old in the summer of 1992. They lived with their mother and step-father in Waukegan, Illinois, and they shared a job babysitting the two young children of Dawn Engelbrecht, a friend of their family.

41.     On the evening of August 17, 1992, while Holly watched the children in Dawn Engelbrecht's Waukegan apartment, a man broke in and brutally raped and murdered Holly, stabbing her dozens of times with a knife. It was a high-profile crime that drew significant media attention in the Chicago area.

42.     Law enforcement officers and other individuals associated with the inter-agency Lake County Major Crimes Task Force investigated the crime. Over the course of several weeks, they gathered hundreds of pieces of physical evidence from the scene, developed and investigated hundreds of leads, and questioned suspects. Despite this initial effort, the investigators could not find the person who had committed the crime.

43.     To this day, the crime remains unsolved. By focusing exclusively on the wrong man, the Lake County Major Crimes Task Force and the Defendants have let the real killer remain at large for two decades.

### Juan Rivera

44.     In the summer of 1992, Plaintiff Juan Rivera was 19 years old. His family had moved to Waukegan from Puerto Rico a couple of years earlier. He lived with his mother, father, and sister.

45.     On the night of Holly Staker's murder, Plaintiff was home with his girlfriend. That evening, he talked on the telephone with his mother, who was at the time visiting relatives in Puerto Rico. Plaintiff's telephone records reflect this phone conversation.

46.     Other records, too, showed that Plaintiff was at home on the night of the murder. Plaintiff had been arrested in Waukegan earlier in 1992 for a non-violent offense involving theft of property. While he was awaiting his court date on that charge and as a condition of his release on bond, Plaintiff was placed on house arrest and was required to wear an electronic transmitter around his ankle. That electronic monitor tracked Plaintiff's every move, and alarms were set off whenever Plaintiff left his family's home. Records of the electronic monitor from the night of the Staker murder show that Plaintiff was at home the entire night.

### The Defendants' Tunnel Vision

47.     For over two months following the murder—from mid-August till late October—the Defendants were unable to solve the case. In that time, the killer's trail had gone cold and the Defendants were under tremendous pressure to solve a crime that had terrorized the community. Moreover, Defendant Waller was up for election for the office of State's Attorney of Lake County for the first time on November 3, 1992.

48.     Plaintiff's 1992 arrest, referenced above, resulted in a guilty plea. While Plaintiff was detained at the Lake County Jail following that plea, he repeated to fellow detainees a story that his friend had told him about a party on the night of Holly Staker's murder and a partygoer who had acted suspiciously and might have been involved in the crime. Soon thereafter, Plaintiff was transferred to Hill Correctional Center in Galesburg, Illinois.

49.     Purportedly acting on a tip from a known jailhouse informant, two of the Police Officer Defendants went to visit Plaintiff at Hill Correctional Center on October 2, 1992. Plaintiff was determined to help the police and to provide them information that Plaintiff thought might help them solve the crime. He told them what he had heard, and he readily provided them with samples of his own blood and hair so that he could be eliminated as a suspect.

50.     Three weeks later, under the guise that they needed Plaintiff to testify before a Grand Jury (testimony he was never asked to give), the Defendants had Plaintiff transferred from Hill Correctional Center to the Lake County Jail on a writ of *habeas corpus ad testificandum*. Plaintiff arrived at the Lake County Jail in the early morning hours of October 27, 1992.

### The Interrogation of Juan Rivera

51.     The Defendants' interrogation of Plaintiff, which took place over the following days, was an extreme and alarming abuse of police power. It was a wholly illegal effort to secure a false confession from Plaintiff in violation of his constitutional rights, by means of physical and psychological coercion.

52.     The interrogation began shortly after Plaintiff arrived at the Lake County Jail, and the questioning and accusation of Plaintiff continued on and off over a period of four days, culminating in more than 24 hours of near constant interrogation at the offices of the Lake County Major Crimes Task Force and the interrogation rooms of John Reid & Associates.

53.     The Defendants knew at all points during their interrogation that Plaintiff was a mere teenager who suffered from intellectual deficits and that he had a history of pronounced emotional problems that would render him especially vulnerable to their coercive techniques. During their interrogation, the Defendants observed that he had great trouble understanding spoken English and had almost no ability to write or read English. After the interrogation, Plaintiff's I.Q. was scored and placed him within the lower 10 percent of the population. In addition, Plaintiff had a well-documented history of psychological and emotional problems, including previous suicide attempts, and he had received psychiatric care and medications to manage those problems.

54.     Plaintiff reported these problems to the Defendants during the interrogation and, as set out below, the Defendants had ample opportunity to observe the severe symptoms and consequences of these psychological problems throughout the course of their interrogation. The Defendants took no steps to limit or to adapt their questioning of Plaintiff in response to these known vulnerabilities. Instead, they did the opposite: they agreed among themselves and acted to exploit Plaintiff's intellectual and emotional weaknesses to secure a confession regardless of whether it was true or false.

55.     Compounding these problems, the Defendants intentionally deprived Plaintiff of sleep throughout the interrogation. At the time that questioning of Plaintiff began on the morning of October 27, 1992, Plaintiff had just been transferred to the Lake County Jail from Hill Correctional Center in western Illinois. Over the night of October 26-27, Plaintiff had been driven more than four hours across the state; he had spent the early morning hours after he arrived at the jail being processed and waiting in a booking cell with many other detainees; and he had not slept.

56.     Plaintiff was not given any opportunity to sleep as the interrogation progressed over the days that followed. As of the morning of October 29, when the Defendants began their uninterrupted, 24-hour-plus marathon of interrogation, Plaintiff had slept at most four hours since he had been in the Defendants' custody. And because the Defendants interrogated Plaintiff for more than 24 hours straight between the morning of October 29 and the afternoon of October 30, when the interrogation finally came to an end, Plaintiff did not sleep at all during the final night of the interrogation. The sleep deprivation heightened the already impermissibly coercive nature of the interrogation.

57.     In addition, in an effort to exhaust and disorient Plaintiff, the interrogation took place in multiple locations at different facilities, and the Defendants employed a substantial team of interrogators. They divided their time between the interrogation rooms of the Lake County Major Crimes Task Force and those of John Reid & Associates in downtown Chicago.

58.     At John Reid & Associates, Plaintiff was interrogated for many hours, subjected to multiple polygraph tests, questioned, and was repeatedly accused of committing the rape and murder of Holly Staker. Defendants John Reid & Associates and Masokas participated closely with the Lake County Major Crimes Task Force's investigation of the Staker murder and helped to interrogate a number of individuals, including Plaintiff.

59.     At points during the interrogation, Defendant Masokas took the lead in interrogating Plaintiff in order to coerce a false confession. In addition, as part of their plan to coerce Plaintiff into implicating himself in the crime, the Defendants lied to Plaintiff and told him that he had failed multiple polygraph exams that had been performed at John Reid & Associates, even though the test results indicated that Plaintiff had been entirely truthful when he denied being involved in the Staker murder.

60.     Whether at the offices of John Reid & Associates or in the interrogation rooms of the Lake County Major Crimes Task Force, the Defendants acted in violation of the Constitution in their effort to implicate Plaintiff in a crime that he had not committed. In addition to their unjustified decision to question Plaintiff over four days (on one occasion without pause for more than 24 hours), to exploit Plaintiff's intellectual and emotional deficiencies, and to deprive Plaintiff of sleep, the Defendants used additional physically and psychologically abusive techniques.

16

61.     The Defendants repeatedly and strenuously accused Plaintiff of the Staker murder over the course of the interrogation, despite Plaintiff's consistent denials of any involvement in the crime. They screamed at Plaintiff for hours at the top of their lungs and often within inches of his face. These strong accusations of guilt were joined with physical violence and threats of violence, which the Defendants used intentionally to intimidate and frighten Plaintiff.

62.     The rooms in which the interrogation took place were closed and locked, and the Defendants made clear to Plaintiff that he was not allowed to leave at any point. At times, the Defendants physically barred Plaintiff from standing up or trying to leave the room as he became desperate to avoid their false accusations of guilt.

63.     In addition, because the Defendants worked in rotating interrogation teams of two or three, with each team questioning Plaintiff for discrete periods of time, the Defendants were able to continue their interrogation of Plaintiff without pause, even when individual Defendants were too exhausted to continue. The Defendants made it perfectly clear to Plaintiff that the interrogation would never end unless he confessed.

64.     The Defendants also failed to give Plaintiff any effective *Miranda* warnings. Further ensuring that Plaintiff's constitutional rights were violated, the Defendants engaged in coercive, deceptive, and diversionary tactics that would have deprived *Miranda* warnings of any force, even if effective warnings had been given. At no point did Plaintiff knowingly or voluntarily waive his right to remain silent or his right to have counsel present at the interrogation.

65.     In fact, the opposite is true: Plaintiff repeatedly invoked his right to remain silent and his right to counsel, only to be ignored by the Defendants. Repeatedly, Plaintiff asked the Defendants to stop their questioning and false accusations and to provide him with a lawyer.

17

Plaintiff persisted in his requests to remain silent and to have a lawyer present during the days-long interrogation, but his requests repeatedly fell on deaf ears.

66.     At no point did the Defendants heed Plaintiff's request and stop their physically and psychologically abusive questioning; at no point did the Defendants permit Plaintiff to terminate the questioning; and at no point was Plaintiff ever provided with a lawyer. The Defendants' uninterrupted accusations and questioning continued as if Plaintiff had said nothing at all.

67.     In the face of the extreme physical and psychological abuse and coercion described above, Plaintiff steadfastly maintained his innocence. Plaintiff told the Defendants over and over that he was innocent and had no connection to Holly Staker's murder. The Defendants ignored Plaintiff and brushed to the side evidence that corroborated Plaintiff's claims of innocence.

68.     After days of interrogation, the Defendants' misconduct finally broke Plaintiff down. In the middle of the night of October 29-30, 1992, approximately 60 hours after his interrogation had begun, Plaintiff suffered a complete psychological collapse. The acute psychosis that Plaintiff suffered was so extreme that he has no recollection of what occurred after his mental breakdown began.

69.     Still the Defendants' illegal and unconstitutional interrogation of Plaintiff did not stop. They continued to question him. At some point that night, the Defendants decided to "hog tie" Plaintiff, cuffing his hands together around one of his legs and wrapping the chain that ran between his leg shackles around the center of his handcuffs, so that Plaintiff could not move at all. After that, they put Plaintiff in a padded "rubber room," which is designated for disturbed detainees who present an obvious risk to themselves.

18

70.     Jail personnel observed Plaintiff there in a catatonic state – eyes open but entirely unresponsive; they noticed that he had wounds on his head; and they saw that Plaintiff had ripped pieces of his own scalp from his skull. That night, the medical professionals at the jail diagnosed Plaintiff as suffering from acute psychosis, and they prescribed him anti-psychotic and other medications (which Plaintiff never had the opportunity to take). The Defendants' extreme interrogation had driven Plaintiff out of his mind.

71.     On the morning of October 30, 1992, only after all the events described above, the Defendants forced Plaintiff to sign a statement that they had written and that implicated him in Holly Staker's murder. The statement signed on the morning of October 30, 1992, was the first of two fabricated confessions that the Defendants would ultimately force Plaintiff to sign that day. The entire time, Plaintiff was in a psychotic stupor; he has no memory of signing either statement.

### Waller's Further Involvement

72.     Defendant Waller was at the time of the investigation running for the office of Lake County State's Attorney. On October 30, he was just four days away from that election. Defendant Waller, the other Prosecutor Defendants who worked in his office, and the Police Officer Defendants had failed to find Holly Staker's killer during their months-long investigation. Under pressure from the community they were desperate to tell the public before the November election that they had solved the crime.

73.     The Prosecutor Defendants and the Police Officer Defendants had been in constant contact during Plaintiff's interrogation. Together, these Defendants made arrangements to ensure that the interrogation could continue uninterrupted over a period of days. They advised one another on what steps should be taken in the interrogation and what techniques should be

used to force Plaintiff to confess, and they kept one another up to speed on their progress toward implicating Plaintiff in the crime at all times during the interrogation.

74.     With respect to Plaintiff's interrogation, the Prosecutor Defendants acted as investigators of the Lake County Major Crimes Task Force, and they repeatedly advised, urged, and ordered the Police Officer Defendants to continue the abusive and coercive interrogation of Plaintiff even though it was plain to all involved that the interrogation was highly improper and that Plaintiff was innocent.

75.     On information and belief, the Prosecutor Defendants also participated personally in the interrogation and the drafting of the false statements incriminating Plaintiff, which Plaintiff was later forced to sign.

76.     After the Defendants forced Plaintiff to sign their first false statement on the morning of October 30, the Police Officer Defendants and the Prosecutor Defendants held a joint meeting in Defendant Waller's office. Copies of the first statement were distributed to all involved.

77.     The Defendants immediately concluded that the statement was so factually inaccurate that it could never be used to connect Plaintiff to the Staker murder. The Defendants discussed every sentence of the statement, pointing out to one another just how dramatically the facts of the statement diverged from and contradicted the evidence they had gathered during their investigation of the Staker murder. In performing this analysis of the fabricated first statement, the Defendants concluded that it could not support any charge of criminal conduct against Plaintiff.

78.     Prior to the time that Plaintiff signed either of the false confessions, all of the Defendants knew that there was no evidence connecting Plaintiff to the rape and murder of Holly

Staker. In addition, they knew of the strong evidence that put Plaintiff at home on the night of the

crime. Knowing that they lacked probable cause to charge Plaintiff with Holly Staker's rape or

murder, the Defendants decided to get another signed statement from Plaintiff, again by any

means.

79.     The interrogators who had secured the first statement from Plaintiff were by their

own admission so exhausted by the prior interrogation sessions that they could not continue any

longer. The Defendants decided that a fresh interrogation team would be sent to continue the

interrogation and to have Plaintiff sign a more accurate "confession." The Defendants briefed

one another on the changes that needed to be made to the statement and they continued their

interrogation of Plaintiff.

80.     Even as the interrogation continued, the Defendants called a press conference to

announce that they had caught Holly Staker's killer. Later in the afternoon of October 30 and

shortly before their press conference was set to begin, the Defendants emerged from the

interrogation with a second false statement. Again, the Defendants had written the statement and

had forced Plaintiff to sign. The Defendants sat down before the local media and proclaimed that

Plaintiff had confessed to the crime.

81.     At no point did the Defendants have any probable cause whatsoever to suspect

that Plaintiff had raped or killed Holly Staker. The manufactured and entirely false statements,

which the Defendants wrote and forced Plaintiff to sign only after days of physical and

psychological abuse and uninterrupted interrogation, are the only "evidence" that connected

Plaintiff to the Staker murder, and they were insufficient to establish probable cause.

82.     Without these false and coerced confessions there was nothing to support a criminal proceeding against Plaintiff. In the absence of the misconduct described above, Plaintiff would not have stood trial and never would have been convicted of the murder of Holly Staker.

### Evidence of Plaintiff's Innocence Ignored

83.     In the midst of the misconduct described in this Complaint, the Defendants willfully ignored and acted to undermine a tremendous volume of evidence that showed conclusively that Plaintiff had nothing to do with Holly Staker's horrible death.

84.     Defendants disregarded the fact that investigators had collected hundreds of pieces of physical evidence from the scene of crime and not a single piece connected Plaintiff to the killing. In fact, the only conclusion that can possibly be drawn from the physical evidence discovered at the scene of Holly Staker's death is that Plaintiff could not have had anything to do with the crime.

85.     In addition, Plaintiff had a verifiable alibi. He had two independent electronic records that placed him at home the entire evening of the crime. First, Plaintiff had been speaking on the phone to his mother in Puerto Rico at the time of Holly Staker's murder, and he had the phone records to prove it. Second, Plaintiff was on house arrest. The electronic monitor around his ankle, which he could not and did not remove, recorded his whereabouts on the night of the crime, and pre-trial services records showed that he had not left his home on the night Holly Staker was killed. Plaintiff's family and girlfriend corroborated these electronic records.

86.     Chief among the physical evidence pointing away from Plaintiff was DNA recovered from semen found inside of Holly Staker's vagina after she was murdered. Following the coerced confession of Plaintiff, testing of that genetic evidence demonstrated with absolute and unquestionable scientific certainty that Plaintiff was not the source of the semen. The DNA

evidence shows that another man raped and killed Holly Staker. Notwithstanding the new DNA evidence, the Police Officer Defendants took further steps to implicate Plaintiff in the crime because, by the time the DNA evidence was developed, they had already elicited Plaintiff's false confession and were determined to conceal their wrongdoing.

### Further Steps to Frame Juan Rivera

87.     Independent of the serious misconduct that led Plaintiff to falsely implicate himself in the rape and murder of Holly Staker, the Police Officer Defendants repeatedly and deliberately withheld evidence that further demonstrated Plaintiff's innocence. In addition, the Police Officer Defendants manufactured false evidence in an effort to frame Plaintiff for rape and murder, while concealing the fact that their manufactured evidence was false. And the Police Officer Defendants improperly coerced, encouraged, and manipulated witnesses to falsely implicate Plaintiff in the crime, without disclosing anything about their actions to procure this false testimony.

88.     The Police Officer Defendants took one or more photographs of Plaintiff over the course of their interrogation, which depicted Plaintiff's poor condition and showed the physical and emotional state caused by the Defendants' misconduct in the course of their abusive and coercive questioning of Plaintiff. The Police Officer Defendants acknowledged that they took these photographs, but they concealed or destroyed them to cover up their investigative malfeasance.

89.      Portions of the Defendants' interrogation of Plaintiff, including those portions conducted in the interrogation rooms of Defendant John Reid & Associates, were recorded on video or audio recording devices. These contemporaneous recordings of the interrogation of Plaintiff are critical, objective evidence that corroborated the Defendants' misconduct in the

course of their interrogation, Plaintiff's steadfast denials of any involvement in the death of

Holly Staker, and his repeated invocation of his right to remain silent and his right to counsel.

These recordings, too, have been concealed or destroyed. Though Plaintiff knew what had

occurred in the portion of the interrogation before he suffered acute psychosis, he could not

definitively prove what had happened during the interrogation without these recordings.

90. The Police Officer Defendants also hid important physical evidence central to the

crime at issue, including but not limited to the murder weapon and fingerprint and footprint

evidence suggesting that someone other than Plaintiff committed the crime.

91. In the aftermath of the crime, the Police Officer Defendants conducted interviews

and investigations of suspects, some of whom admitted or suggested their direct involvement in

the crime. Reports of those investigations and statements that those suspects made to the Police

Officer Defendants were suppressed or destroyed. Similarly, the Police Officer Defendants

withheld numerous tips, leads, and information given to them by individuals with direct

knowledge of the crime, which pointed away from Plaintiff and showed that he had not

committed the Staker murder.

92. The Police Officer Defendants recruited individuals, including known jailhouse

snitches, and elicited false testimony from these individuals implicating Plaintiff in the Staker

murder. Some of these individuals gave false statements and testified that Plaintiff had suggested

and even confessed to them that he had been involved in the crime, when, in fact, no such

conversations ever took place. Others provided false statements and evidence that the Police

Officer Defendants used to undermine the clear evidence of Plaintiff's innocence, such as the

fact that Plaintiff was on electronic monitoring and at home on the night of the Staker murder.

93.     The Police Officer Defendants recruited these individuals and jailhouse snitches and caused them to provide false evidence implicating Plaintiff in the crime, all the while knowing that these statements were entirely false.

94.     To procure this false testimony, the Police Officer Defendants made improper, undisclosed promises and offered impermissible incentives to these individuals, and they coerced others to tell lies. The entire time, the Police Officer Defendants concealed information about the improper promises that they had made and their course of misconduct in securing false statements from these individuals and jailhouse snitches.

95.     The Police Officer Defendants also pressured and manipulated witnesses, including people victimized by the crime, to identify Plaintiff as someone they had seen at the crime scene. The Police Officer Defendants accomplished this task by using suggestive photo identification techniques and by conducting unreliable in-person "line ups." They forced witnesses to agree to identify Plaintiff even though those witnesses had already told the Police Officer Defendants that they could not identify Plaintiff as someone connected to the crime, and they made improper promises to witnesses in exchange for their identification of Plaintiff. The Police Officer Defendants concealed the improper conduct by which they secured these false identifications.

96.     If Plaintiff had been given access to this information about witnesses, it would have been powerful evidence of his innocence and critical evidence by which he could have impeached both the individuals who testified falsely against him and also the Police Officer Defendants who testified that the evidence they had gathered in their investigation pointed toward Plaintiff.

97.     After Plaintiff was forced to implicate himself in Holly Staker's rape and murder, the Police Officer Defendants produced a series of false and fraudulent police reports and related memoranda, which they inserted into their case file. These documents, which were evidence used to show Plaintiff's purported connection to the crime, contained statements and described events that were fabricated and that the Police Officer Defendants knew to be false. The Police Officer Defendants signed these reports, both as investigators and as supervisors, despite their knowledge that the information contained in those reports was entirely false.

98.     The Police Officer Defendants concealed the misconduct described above from Plaintiff, his criminal defense attorneys, and the prosecutors involved in his criminal case, including the Prosecutor Defendants. Indeed, the Police Officer Defendants continue to this day to conceal evidence in their possession demonstrating Plaintiff's innocence; and they continue to hide their own fabrication of evidence and their improper manipulation of witnesses.

99.     Supervisors of the Police Officer Defendants knew full well of the Police Officer Defendants' misconduct and their fabrication of a case against Plaintiff. These supervisors nevertheless intentionally ignored the Police Officer Defendants' misconduct, and decided to make Plaintiff responsible for a crime he did not commit, rather than directing the officers to go out and find the person who had raped and killed Holly Staker.

100.     The Police Officer Defendants' misconduct deprived Plaintiff of evidence that would have established further that he had no connection to Holly Staker's rape and murder and that would have pointed toward the person who had actually committed the crime.

**Plaintiff's Wrongful Conviction and Imprisonment**

101.    As a result of the Defendants' misconduct, Plaintiff was tried in November 1993 on charges of rape and murder in the Circuit Court of Lake County. A jury convicted Plaintiff of first-degree murder. The jury could not agree unanimously on the death penalty, and so the trial judge sentenced Plaintiff to life in prison without the possibility of parole. Plaintiff might otherwise have been put to death.

102.    Without the Defendants' false and fabricated confessions, secured by the extreme misconduct described herein, Plaintiff would never have been convicted.

103.    Plaintiff turned 20 years old on the day he learned that he was being charged with raping and murdering a young child. He would spend most of the next 20 years of his life imprisoned in maximum-security facilities within the Illinois Department of Corrections.

104.    Plaintiff's whole life was turned upside down without any warning. His young adulthood – a full half of his life as of the date of this Complaint – has been consumed by the horror of his wrongful imprisonment.

105.    Plaintiff was taken away from his mother and father, from his siblings and other relatives, and from his friends. Because of the Defendants' misconduct, Plaintiff has missed out on the lives of his family and friends. He has returned home to aging parents and to relationships changed or lost by years away.

106.    Plaintiff was stripped of his young adulthood; he was deprived of opportunities to gain an education, to engage in meaningful labor, to develop a career, and to pursue his interests and passions; he was forced to delay starting a family of his own. Plaintiff has been deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

107.     During his 20 years of wrongful imprisonment, Plaintiff was detained in harsh and dangerous conditions in maximum security prisons.

108.     Plaintiff had been convicted of violently raping and murdering a young girl, and the prison culture in which Plaintiff was detained infamously exacts its own retribution for this sort of crime. Plaintiff was stabbed twice in prison because of the crime he had been falsely accused of committing. On three other occasions, inmates attempted to rape Plaintiff.

109.     Because Plaintiff had been sentenced to life in prison without parole, he feared that he would die alone inside the prison walls.

110.     In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and other physical and psychological effects.

### Plaintiff's Exoneration

111.     On December 9, 2011, the Illinois Appellate Court held in a unanimous opinion that Plaintiff's conviction could not stand. The court held that a rational jury could never have convicted Plaintiff, and it reversed his conviction and entered judgment of acquittal in his favor.

112.     Defendant Waller declined to appeal this decision and, on January 6, 2012, after nearly 20 years in prison, Plaintiff walked out of prison a free man for the first time since his teenage years.

## COUNT I

## 42 U.S.C. § 1983 – Coerced and False Confession (Fifth Amendment)

113.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

114.     In the manner described more fully above, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his rights secured by the Fifth and Fourteenth Amendments.

115.     As described more fully above, the Police Officer Defendants and the Prosecutor Defendants participated in, encouraged, advised, and ordered an unconstitutional, multi-day interrogation of Plaintiff, which caused Plaintiff to make involuntary statements implicating himself in the rape and murder of Holly Staker.

116.     The false statements written by the Defendants and attributed to Plaintiff were used against Plaintiff to his detriment in a criminal case. These statements were the only reason that Plaintiff was prosecuted and convicted of the Staker murder.

117.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

118.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

119.     Plaintiff's injuries were caused by the policies, practices, and customs of Defendants Lake County Major Crimes Task Force, Lake County, the Lake County Sheriff's

Department, the City of Waukegan, the City of Lake Forest, the Village of Buffalo Grove, and the Unknown Municipalities of the Lake County Major Crimes Task Force.

120.    At all times relevant to the events described in this Complaint and for a period of time prior thereto, the agencies and municipalities referenced in the preceding paragraph promulgated rules, regulations, policies, and procedures for the conduct of interrogation, testing, and questioning of criminal suspects by officers and agents of the Lake County Major Crimes Task Force and its constituent agencies and municipalities. In addition, the agencies and municipalities referenced in the preceding paragraph promulgated rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Lake County Major Crimes Task Force and its constituent agencies and municipalities, with respect to the conduct of interrogations and the techniques to be used when questioning criminal suspects. Moreover, the agencies and municipalities referenced in the preceding paragraph provided training and training materials to members of the Lake Country Major Crimes Task Force on the subject of criminal interrogations. The Lake County Major Crimes Task Force, and its constituent agencies and municipalities, adopted these rules, regulations, policies and procedures, such that they became the policies and procedures of the Lake County Major Crimes Task Force and its constituent agencies and municipalities.

121.    These rules, regulations, policies, and procedures were implemented by officers and agents of the Lake County Major Crimes Task Force and its constituent agencies and municipalities, including the Defendants, who were responsible for conducting interrogations of individuals suspected of criminal wrongdoing by the Lake County Major Crimes Task Force.

122.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendants Lake County Major Crimes Task Force, Lake County,

the Lake County Sheriff's Department, the City of Waukegan, the City of Lake Forest, the Village of Buffalo Grove, and the Unknown Municipalities of the Lake County Major Crimes Task Force had notice of a widespread practice by officers and agents of the Lake County Major Crimes Task Force and its constituent agencies and municipalities under which individuals suspected of criminal activity, such as Plaintiff, were routinely coerced against their will to implicate themselves in crimes that they had not committed. It was common that suspects interrogated in connection with investigations within the jurisdiction of the Lake County Major Crimes Task Force falsely confessed, under extreme duress and after suffering abuse, to committing crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

123.     Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice among officers, employees, and agents of the Lake County Major Crimes Task Force and its constituent agencies and municipalities under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to the following: (1) individuals, including minors and individuals with mental disabilities and psychiatric conditions, were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical and psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to have an attorney present or to remain silent; (4) individuals were forced to sign false statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily or falsely; and (6) supervisors with

knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

124.    These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of Defendants Lake County Major Crimes Task Force, Lake County, the Lake County Sheriff's Department, the City of Waukegan, the City of Lake Forest, the Village of Buffalo Grove, and the Unknown Municipalities of the Lake County Major Crimes Task Force directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

125.    The above widespread practices, so well settled as to constitute *de facto* policy of the Lake County Major Crimes Task Force and its constituent agencies and municipalities, were able to exist and thrive because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

126.    In addition, the misconduct described in this Count was undertaken pursuant to the policy and practice of Defendants Lake County Major Crimes Task Force, Lake County, the Lake County Sheriff's Department, the City of Waukegan, the City of Lake Forest, the Village of Buffalo Grove, and the Unknown Municipalities of the Lake County Major Crimes Task Force in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the Lake County Major

Crimes Task Force and its constituent agencies and municipalities or were actually committed by persons with such final policymaking authority.

127.    The policies, practices, and customs set forth above have resulted in numerous well-publicized false confessions, including the false confession at issue in this Complaint, in which individuals were convicted of crimes that they did not commit after being subjected to abusive interrogation techniques.

128.    Plaintiff's injuries were caused by officers, agents, and employees of the Lake County Major Crimes Task Force and its constituent agencies and municipalities, including but not limited to the individually named Defendants, who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT II
### 42 U.S.C. § 1983 – Coerced and False Confession (Fourteenth Amendment)

129.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

130.    In the manner described more fully above, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his right to due process secured by the Fourteenth Amendment.

131.    As described in detail above, the misconduct described in this Count was done using extreme techniques of physical and psychological coercion and torture. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

132.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

133.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

134.    Plaintiff's injuries were caused by the policies, practices, and customs of Defendants Lake County Major Crimes Task Force, Lake County, the Lake County Sheriff's Department, the City of Waukegan, the City of Lake Forest, the Village of Buffalo Grove, and the Unknown Municipalities of the Lake County Major Crimes Task Force, as set out in Count I, above, which were implemented by officers, agents, and employees of these entities, including but not limited to the individually named Defendants, who acted pursuant to these policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT III
## 42 U.S.C. § 1983 –Federal Malicious Prosecution[1]

135.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

136.    In the manner described above, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew

---

[1] Plaintiff recognizes that this Circuit currently holds that malicious prosecution is not actionable under 42 U.S.C. § 1983. Other Courts of Appeals have taken the opposite position. Plaintiff pleads the claim here under the Fourth and Fourteenth Amendments to preserve the issue for reconsideration in the U.S. Court of Appeals for the Seventh Circuit or review in the Supreme Court of the United States.

Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

137.    In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

138.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

139.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IV
## 42 U.S.C. § 1983 – Due Process

140.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

141.    As described in detail above, the Police Officer Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

142.    In the manner described more fully above, the Police Officer Defendants deliberately withheld exculpatory evidence from Plaintiff and from the Prosecutor Defendants, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

143.    In addition, the Police Officer Defendants fabricated and solicited false evidence, including testimony that they knew to be false and perjured and fabricated police reports, implicating Plaintiff in the crime, obtained Plaintiff's conviction using that false evidence, and

failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

144.     In addition, the Police Officer Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

145.     The Police Officer Defendants' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fifth and Fourteenth Amendments. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

146.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

147.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

148.     Plaintiff's injuries were caused by the policies, practices, and customs of Defendants Lake County Major Crimes Task Force, Lake County, the Lake County Sheriff's Department, the City of Waukegan, the City of Lake Forest, the Village of Buffalo Grove, and the Unknown Municipalities of the Lake County Major Crimes Task Force, in that employees and agents of the Lake County Major Crimes Task Force and its constituent agencies and municipalities regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating criminal defendants in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a similar manner to that alleged herein.

149.     The above-described widespread practices, which were so well-settled as to constitute the *de facto* policy of the Lake County Major Crimes Task Force and its constituent agencies and municipalities, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it. Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the Lake County Major Crimes Task Force and its constituent agencies and municipalities declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

150.     The misconduct described in this Count was undertaken pursuant to the policy and practices of the Lake County Major Crimes Task Force and its constituent agencies and municipalities in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the Lake County Major Crimes Task Force and its constituent agencies and municipalities, or were actually committed by persons with such final policymaking authority.

151.     The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

### COUNT V
### 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

152.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

153.     After the murder of Holly Staker, the Police Officer Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to

frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

154.     In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

155.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

156.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

157.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VI
### 42 U.S.C. § 1983 – Failure to Intervene

158.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

159.     In the manner described above, during the constitutional violations described herein, one or more of the individual Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

160.     As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. These Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

161.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

162.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VII
### State Law Claim – Malicious Prosecution

163.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

164.     In the manner described above, the Police Officer Defendants and the Prosecutor Defendants, acting as investigators, individually, jointly, or in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

165.     In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

166.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

167.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII

### State Law Claim – Intentional Infliction of Emotional Distress

168.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

169.     The actions, omissions, and conduct of the Police Officer Defendants and the Prosecutor Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

170.     As a direct and proximate result of the Defendant Officers' actions, Plaintiff suffered and continues to suffer emotional distress and other grievous and continuing injuries and damages as set forth above.

## COUNT IX

### State Law Claim – Civil Conspiracy

171.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

172.     As described more fully in the preceding paragraphs, the Police Officer Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

173.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

174. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

175. As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X
## State Law Claim – Defamation

176. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

177. Defendants Mermel, Tessman, and Maley each waged campaigns against Plaintiff, in which they advanced and caused to be published intentionally false and misleading statements and lies about or concerning Plaintiff that they knew to be false, including repeatedly accusing Plaintiff falsely of rape and murder, and in so doing committed defamation *per se*.

178. Defendant Mermel issued a great number of defamatory statements concerning Plaintiff. Some of these statements were published in November 2011 in the *New York Times*, where Defendant Mermel is quoted as saying that 11-year-old Holly Staker and her twin sister, Heather, had been sexually active before Holly was killed, and that Holly had sex with someone else on the day of her murder, after which Plaintiff came along and raped (but didn't ejaculate) and murdered Staker.

179. These defamatory statements of or concerning Plaintiff were Defendant Mermel's nonsensical explanation of how Plaintiff raped and killed Holly Staker even though semen and DNA found inside of the victim after her murder conclusively excluded Plaintiff.

180. In a separate statement of or concerning Plaintiff, in which Mermel attempted to impugn the exculpatory DNA evidence that proved that Plaintiff had not been involved in the

crime, Defendant Mermel stated: "We don't fold our tents and run . . . we don't quaver because somebody holds up three letters: DNA."

181.     Defendant Mermel supported his offensive and defamatory statements that Plaintiff was a rapist and murderer and that his victim had been sexually promiscuous at age 11 by analogizing the DNA found inside of Holly Staker to genetic materials that one might find on a hotel room television remote control. "The example I like to give people," said Defendant Mermel, "is next time you go to a motel room, bring a plastic bag, because the dirtiest thing in the room is the remote control. Everybody has sex and then rolls over and goes, 'I wonder what's on?' . . . . O.K., so you can find DNA in the form of sperm from 10 different people in that room from that remote control or even on a person who has touched it. And that woman gets murdered in that room tonight and you are going to have a lot of DNA. Is it all going to be forensically significant?" In this statement of or concerning Plaintiff, Mermel was telling the world that the DNA found inside of Holly Staker was insignificant because Plaintiff was the person who actually had violently raped and killed Holly Staker.

182.     Defendant Mermel's defamatory statements about Plaintiff were made after his involvement in the criminal case against Plaintiff had ended. In addition, his statements were not made in connection with his employment with the Lake County State's Attorney Office. In fact, Defendant Mermel's comments rightfully brought his career as a prosecutor in that office to a close.

183.     Shortly after his comments were made, Defendant Curran, the Lake County Sheriff and chief law-enforcement officer in Lake County, called for Defendant Mermel's resignation, saying that he was disgusted by Defendant Mermel's comments. Defendant Waller issued a public apology for Defendant Mermel's comments, proclaiming, "The comments

attributed to Mike Mermel do not reflect my views on the role of the Lake County State's Attorney's Office. Nor do they reflect the manner in which my staff has conducted themselves over the last 21 years." In no uncertain terms, Defendant Mermel's office disavowed and disowned his defamatory statements of or concerning Plaintiff.

184.    In the end, Defendant Mermel was forced to resign his job as a prosecutor because of his comments, and he did so just a couple of weeks after they had been published.

185.    Defendants Tessman and Maley also defamed Plaintiff long after their involvement in Plaintiff's unjust criminal prosecution had come to an end. In the same *New York Times* article mentioned above, Defendants Tessman and Maley each stated falsely that Plaintiff had committed murder and rape.

186.    When Defendant Tessman was asked about Plaintiff's case, he discussed his belief that Plaintiff was a rapist and murderer and proclaimed, "[Plaintiff is guilty as the day is long."

187.    Defendant Maley joined in Defendant Tessman's statement, saying bluntly: "I can tell you 100 percent that Juan Rivera did the murder."

188.    By engaging in the misconduct described in this Count, Defendants Mermel, Tessman, and Maley made demonstrably false statements about and concerning Plaintiff, and they caused those statements to be widely published in major public newspapers distributed throughout the entire world. The things these Defendants said about or concerning Plaintiff were malicious, shocking, outrageous, and offensive, and these Defendants made these statements knowing that they were entirely false.

189. The statements made by Defendants Mermel, Tessman, and Maley described above are wholly untrue accusations of rape and murder, which constitute defamation *per se* in Illinois.

190. Defendants Mermel, Tessman, and Maley were angered by the fact that Plaintiff's case had become a poster child of official misconduct and that their actions had been subject to intense scrutiny and criticism in local and national media and in the law enforcement and legal communities. As a result, these Defendants were determined to advance their own agendas and to counter-attack Plaintiff by falsely asserting that he was a rapist and murderer. In doing so, Defendants Mermel, Tessman, and Maley acted with actual malice, reckless intent and gross indifference to the false and misleading nature of their statements about and concerning Plaintiff when they made them to national media outlets.

191. These defamatory falsehoods were made with actual malice by Defendants inasmuch as they knew of their falsity or recklessly disregarded their truth or falsity.

192. As a result of Defendants' misconduct described in this Count, Plaintiff suffered injuries, including but not limited to reputational damages, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

193. In particular, the Defendants' defamatory falsehoods have and continue to injure Plaintiff in the following ways, among others: (a) by impugning Plaintiff's personal reputation in the community such that individuals who Plaintiff interacts with question whether he is a rapist and murderer; (b) by limiting Plaintiff's employment options and his future career prospects; and (c) by subjecting Plaintiff to harassment and additional persecution for a crime he did not commit.

194.     The actions and omissions of Defendants Mermel, Tessman, and Maley set forth in this Count demonstrate malice, egregious defamation, and insult. These Defendants' actions and omissions were undertaken either with malice, spite, ill will, vengeance, or deliberate intent to harm Plaintiff, or with reckless disregard to the falsity of the speech and its effect on Plaintiff. Accordingly, Plaintiff is entitled to punitive damages and attorneys' fees beyond those damages, described above, that will compensate Plaintiff for injuries resulting from the Defendants' conduct.

## COUNT XI
## State Law Claim – Respondeat Superior

195.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

196.     While committing the misconduct alleged in the preceding paragraphs, the Defendants were employees, members, and agents of the Lake County Major Crimes Task Force, the Lake County Sheriff's Department, the City of Waukegan, the City of Lake Forest, the Illinois State Police, the Lake County State's Attorney's Office, and John Reid & Associates, acting at all relevant times within the scope of their employment.

197.     Defendant Lake County Major Crimes Task Force, by Lake County, the Lake County Sheriff's Department, the City of Waukegan, the City of Lake Forest, the Village of Buffalo Grove, and the Unknown Municipalities of the Lake County Major Crimes Task Force, is liable as principal for all torts committed by its agents.

198.     Defendant Sheriff of Lake County is liable as principal for all torts committed by his agents. Defendant City of Waukegan is liable as principal for all torts committed by its agents. Defendant City of Lake Forest is liable as principal for all torts committed by its agents. Defendant John Reid & Associates is liable as principal for all torts committed by its agents.

## COUNT XII
### State Law Claim – Indemnification

199.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

200.     Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

201.     The Defendants were employees, members, and agents of the Lake County Major Crimes Task Force, the Lake County Sheriff's Department, the City of Waukegan, the City of Lake Forest, the Village of Buffalo Grove, the Illinois State Police, the Lake County State's Attorney's Office, and John Reid & Associates, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

202.     Lake County is obligated by Illinois statute to pay any judgment entered against the Sheriff of Lake County in his official capacity.

203.     Lake County is obligated by Illinois statute to pay any judgment entered against the Prosecutor Defendants.

WHEREFORE, Plaintiff JUAN A. RIVERA, JR., respectfully requests that this Court enter a judgment in his favor and against Defendants LAKE COUNTY, Illinois, LUCIAN TESSMAN, CHARLES FAGAN, MICHAEL MALEY, DONALD MEADIE, MICHAEL BLAZINCIC, JAMES HELD, FERNANDO SHIPLEY, HOWARD PRATT, RICHARD DAVIS, DAVID OSTERTAG, JAMES GENTILCORE, PHILIP STEVENSON, ROBERT BOONE, GARY DEL RE, ESTATE OF CLINTON GRINNELL, MARK CURRAN, Lake County Sheriff, in his official capacity, CITY OF WAUKEGAN, CITY OF LAKE FOREST, VILLAGE OF BUFFALO GROVE, the LAKE COUNTY MAJOR CRIMES TASK FORCE, UNKNOWN POLICE OFFICERS, UNKNOWN MUNICIPALITIES OF THE LAKE

COUNTY MAJOR CRIMES TASK FORCE, JOHN REID & ASSOCIATES, INC., MICHAEL MASOKAS, UNKNOWN EMPLOYEES OF JOHN REID & ASSOCIATES, MICHAEL WALLER, JEFFREY PAVLETIC, MATTHEW CHANCEY, STEVEN McCOLLUM, and MICHAEL MERMEL, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the individual Defendants, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, JUAN A. RIVERA, JR., hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**JUAN A. RIVERA, JR.**

BY:  /s/ Steven Art
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Michael Kanovitz
Russell Ainsworth
Elizabeth Mazur
Scott Rauscher
Steven Art
LOEVY & LOEVY
312 N. May St., Ste. 100
Chicago, IL 60607
(312) 243-5900

Locke E. Bowman
Sheila Bedi
David Shapiro
Alexa Van Brunt
RODERICK MACARTHUR JUSTICE CENTER
Northwestern University School of Law
375 E. Chicago Avenue
Chicago, Illinois 60611
(312) 503-0844

J. Samuel Tenenbaum
BLUHM LEGAL CLINIC
Northwestern University School of Law
375 E. Chicago Avenue
Chicago, Illinois 60611
(312) 503-8576