UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JUAN A. RIVERA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No: 1:12-cv-08665 ) Honorable Harry D. Leinenweber |
| LAKE COUNTY ILLINOIS, et al., | ) ) ) |
| Defendants. | ) |

**REPLY IN SUPPORT OF CITY OF WAUKEGAN'S MOTION TO QUASH PLAINTIFF'S NOVMEBER 19, 2014 SUBPOENA TO NORTHEASTERN ILLINIOS REGIONAL CRIME LABORATORY**

Now comes Defendant City of Waukegan ("Waukegan"), by and through its attorneys, Trobe, Babowice & Associates, LLC, for its Reply in Support of the Motion to Quash the November 19, 2014 Subpoena issued by Plaintiff to Northeastern Illinois Regional Crime Laboratory, states as follows:

**INTRODUCTION**

Plaintiff's Response fails to justify the testing sought pursuant to the subpoena to the Northeastern Illinois Regional Crime Laboratory ("NIRCL"). First, Plaintiff's Response does not explain how it is even conceivably possible that testing the 20+ year old Voit shoes and the related materials could possibly pinpoint the moment in time that blood appeared on the shoes. The Response suggests, without expert support, that current testing methods can identify DNA and drill down on the exact date of that DNA's placement on the shoes. This argument is deeply flawed and not supported by a shred of scientific corroboration. Rather, Plaintiff sets forth only conclusions based on select reports attached to the Response. This case involves thousands of

1

pages of lab reports, notes, and chain of custody documents. It is not possible to give an accurate overview of complex DNA issues in a legal brief devoid of expert substantiation.

Second, Plaintiff's argument is dependent on the assumption that David Asma's research regarding the availability of the shoes in 1992 is correct. The crucial assumptions relied upon by Plaintiff are set forth in a 1992 Asma memo, which is nothing more than inadmissible hearsay within inadmissible hearsay. At a minimum, any conclusion about the availability of the shoes is premature at this stage of discovery on the issue. Moreover, many of the purported commercial documents mentioned as supporting Asma's memo are not attached to Plaintiff's Response and counsel for Waukegan has been unable to locate the alleged documents within Plaintiff's production. Significantly, Plaintiff points to no document constituting arguably admissible evidence in support of the contention that a first batch of the Voit shoes was manufactured and shipped to the United States in late July of 2017 and that the shoes were not available for purchase at the time of Holly's murder. In fact, Walmart records produced by Plaintiff impeach this assertion.

Third, the Response cleverly omits mention that all physical evidence in the possession of NIRCL[1] and the Illinois State Police ("ISP") Crime Laboratory was released to Plaintiff's retained lab, the Serological Research Institute ("SRI"), for testing by Plaintiff in 1993. A cursory review of the Response leaves the reader with the impression that the Voit shoes were in the possession of law enforcement, NIRCL, or the ISP crime labs since the time of the shoes' recovery in November of 1992. However, in March of 1993, Plaintiff's criminal defense attorney obtained an order releasing all evidence in the possession of NIRCL and ISP to SRI for

---

[1] NIRCL was referred to as "Northern Illinois Police Crime Laboratory" at the time of Plaintiff's first criminal trial in 1993.

testing in support of Plaintiff's defense. Pursuant to that order, Plaintiff's own experts had the Voit shoes and the paper packets which contained the thread stains in their possession for an extended period of time in 1993 along with the other crime scene evidence. Thus, any claims that the officer Defendants had virtually exclusive control over the Voit shoes is false. Based on this fact alone, and assuming that Plaintiff's claim of cross-contamination is ever corroborated, Plaintiff's lab is just as likely to have cross contaminated the Voit shoes and the paper packets which contained the thread stains.

Fourth, the Response suggests that there are testing materials in the possession of the ISP Crime Lab that support Plaintiff's argument for testing. However, ISP sent a response to a prior subpoena issued by Plaintiff which definitively states that no testing materials related to the shoes are in its possession. Plaintiff clouds the issue before the Court by intermingling references to materials in the possession of NIRCL and those that may have been in ISP's possession in the past. Plaintiff's argument for testing is premised in part upon the assumption that the ISP testing materials are available. Even if Plaintiff's Response had set forth a coherent argument for that which testing might conceivably demonstrate based on comparing materials from NIRCL and ISP - and it has not - the unavailability of the ISP materials undercuts Plaintiff's argument further.

Fifth, the balancing of relative prejudice favors Waukegan. At issue here is destruction of physical evidence that may be needed in a future state court criminal proceeding. Plaintiff cannot deny that a defendant in a future prosecution has the right under the Illinois constitution to retest the shoes, if testing is feasible. Indeed, Plaintiff himself had the shoes tested before his first criminal trial. Yet, Plaintiff seeks destructive testing that will consume all remaining DNA of Unknown Male #1. This, despite the fact that Plaintiff has not established that the

3

reinvestigation testing done by NIRCL is insufficient in any respect.  Moreover, an order denying Plaintiff the ability to test the shoes and related material now does not preclude Plaintiff from arguing that blood was planted on the shoes.  Testing the shoes does not relate Plaintiff's ability to prove whether the shoes were available for purchase at the time of the murder and the testing cannot establish when blood was placed on the shoes.  Plaintiff's effort to recover here should not compromise an ongoing criminal investigation or trump a future criminal defendant's ability to request independent testing of potentially key physical evidence in a murder prosecution.

## **ARGUMENT**

<u>Plaintiff Fails to Explain How the Proposed Testing Supports his Theory</u>

Plaintiff's Response concedes that every stain on the Voit shoes was placed on the shoes at the same time.  With that concession, Plaintiff's Response validates an assumption that undercuts any argument that the testing of the shoes by Plaintiff's lab will produce anything of probative value.  Because Plaintiff cannot eliminate the possibility that every blood stain on the shoes appeared at the same time, it is impossible to correlate any particular person's possession of the shoes with the appearance of a particular blood stain.  In order to do this, Plaintiff would have to somehow establish the time of the DNA's placement on the shoes through a degradation analysis.  In other words, Plaintiff would have to show that a known quantity of DNA was placed on the shoe at some discrete point in time during the past 22 years and that the DNA has degraded at an ascertainable rate sufficient to support backdating to the assumed original placement of the DNA.  All of this would have to be explained while controlling for a myriad of environmental factors that may have retarded or accelerated the degradation of DNA.  However, Plaintiff has not attempted to do this.  Instead, Plaintiff filed a brief without expert support,

which suggests that his lab can provide snapshots of precise moments in time when DNA appeared on the shoes and that somehow, this will lead to the development of probative evidence of when the DNA was placed.

That Plaintiff would make such a bold claim is startling, especially when failing to attach the affidavit or report of a single scientist to corroborate such a claim. Common sense dictates that no lab could recreate unverifiable conditions occurring over the past 22 years and then proceed to determine when DNA was placed on shoes. This is especially true considering the time frame at issue here. The murder occurred on August 17, 1992. Task Force investigators recovered the shoes on November 23, 1992. Nothing supports Plaintiff's argument that testing under today's methods would allow a person to deduce to the day or week that DNA was placed on the shoe.

Additionally, the suggestion that Holly Staker's blood was on the shoes is premised entirely upon the 1993 ISP crime lab report which narrows the donor of the DNA pulled from the tongue of the right shoe to three percent (3%) of the African American population and seven percent (7%)of the Caucasian population. Nothing attached to Plaintiff's Response provides more definitive support for the allegation that the blood on the shoes was Holly's. Counsel for Waukegan is aware of no result generated by NIRCL during the 2012 testing, or since, that provides support for the allegation that Holly's blood is on the shoes. Certainly, had it existed, Plaintiff's counsel would have attached such a report to the Response. Thus, Plaintiff's theory that Holly's blood was on the shoes is speculative at best.

Plaintiff Fails to Identify How NIRCL'S Testing Was Insufficient

Considering the important issues at stake relative to an ongoing criminal investigation and the potential rights of a future defendant in a murder case, Plaintiff might have been expected to explain how NIRCL's testing somehow failed to detect Holly Staker's blood on the shoes or the related materials. Plaintiff's counsel has not deposed a single person from NIRCL and has not noticed such a deposition. Instead, Plaintiff has simply subpoenaed documents, and without expert corroboration of its claims, now insists that the shoes and related materials must be immediately shipped to Plaintiff's designated lab in California. Plaintiff should be required to determine if NIRCL has failed conduct a test that Plaintiff's designated lab is capable of performing. In the absence of this determination, testing by SRI adds nothing to the equation.

David Asma's Memo and the Documents Attached to the Response Do Not Establish the Unavailability of the Shoes

Not a single document attached to the Response forecloses the following possibilities with respect to the manufacture and distribution of the Voit shoes:

- Assuming that Walmart was the only retailer of the Voit shoes, that there was more than one purchase order for the shoes and Plaintiff purchased the shoes prior to the murder pursuant to shipments not reflected in the documents relied upon by Plaintiff.
- Assuming that Walmart was the only retailer of the Voit shoes, that it placed one purchase order but that a number of Voit shoe shipments predating the shipments referred to in Asma's memo allowed Plaintiff to obtain the shoes in the memo.
- There were other retailers that sold the Voit shoes prior to Walmart stocking the shoes.

- Walmart sold the Voit shoes outside of Northern Illinois or the United States before they were sold in Northern Illinois and Plaintiff obtained the shoes elsewhere.
- The Voit shoes were shipped to Walmart stores, including the Walmart stores in Northern Illinois, without invoices, preventing David Asma from accurately determining when they were first stocked in Walmart stores.
- David Asma did not examine the full universe of documents available to him relative to the time frame that the Voit shoes were available for purchase or that he did not ask the correct questions that would allow him to come to the conclusions arrived at in his memo.

Nothing attached to the Response demonstrates conclusively what Asma based his conclusions on relative to the manufacture and distribution of the Voit shoes. For example, no purchase order for the Voit shoes from Walmart to the manufacturer is attached. Nor is there any sworn testimony from any person at Walmart, or anyone else in the supply chain, establishing that there was only one purchase order for the Voit shoes or that Walmart was the exclusive retailer of the Voit shoes. Based on the documents attached to the Response, it is not possible to determine how many shoes were produced, where they were shipped, and when and where the shoes were stocked by Walmart or any other retailer.

The Asma memo and the unauthenticated documents filed with the Response are inadmissible hearsay. Without authentication, they should be ignored. Moreover, other documents produced by Plaintiff, and not attached to the Response, raise questions about the assertions in the Asma memo. For instance, the Asma memo claims that the shoes were shipped from Hong Kong to the United States between July 30, 1992 and August 7, 1992. A document

entitled "WAL-MART IMPORT SYSTEM (WIS) IMPORT PURCHASE ORDER" ("Walmart Purchase Order"), produced by Plaintiff on October 27, 2014, has an entry in the upper left hand corner of the document numbered JAR 116747 which indicates that the shoes were to be shipped to the west coast of the United States between June 23, 1992 and June 30, 2012. (See Ex. 1) This date range for shipment predates by more than a full month the dates the Asma memo claims the shoes were shipped to the United States.

Asma himself, in another letter produced by Plaintiff, but not attached to the Response, discovered that "occasionally a shipment of merchandise arrives without a shipping invoice." (See Ex. 2) This led Asma to question how Plaintiff's parents allegedly bought the Voit shoes at a Gurnee Walmart store on October 3, 1992 when the first invoice showing a shipment of the shoes to that store in Asma's possession was apparently dated October 5, 1992. *Id*. A copy of said October 5, 1992 invoice is not attached to the Response and counsel for Waukegan has not been able to locate the invoice in Plaintiff's production.

The documents attached to Plaintiff's Response raise further questions. Perhaps the most glaring question is raised by the register tape allegedly recovered by Asma showing the purchase of an item on October 3, 1992 for a price of $19.97. (See Plaintiff's Ex. V) Plaintiff argues that this register tape demonstrates the cash purchase by Plaintiff's parents of the Voit shoes. However, also appearing on the page with the register tape is a price list which includes prices for the Voit shoes at the regular amount of $26.97 and the promotional price of $18.97. *Id.* Consistent with this price list, the Walmart Purchase Order indicates that the price for the Voit shoes was $26.97 rather than $19.97. (See Ex. 1) The Response fails to explain this discrepancy in the purported proof of purchase on October 3, 1992.

8

The documents produced by Plaintiff also demonstrate that fact issues exist as to the identity of the vendor of the Voit shoes. This raises a concern as to whether or not Mr. Asma questioned all possible vendors of the Voit Shoes. The Asma memo refers to the vendor of the Voit shoes as "Hong Kong vender (B.A.R.T.E.R)." However, a document entitled "WM Quality Shoes React Report" produced by Plaintiff lists the vendor as "Hutcheson". (See Ex. 3) Adding to the confusion is a letter from E.S. Originals, Inc. dated May 6, 1993, and produced by Plaintiff, which states "[t]his letter is to verify that we have shipped black Voit hi-top Activator shoes with the attached markings and product # 52806 to Walmart Stores." (See Ex. 4)

Based on the confusion as to the identity of the vendor of the shoes to Walmart, it is difficult to accept at face value Asma's assertion that the 52806 product number is exclusive to Voit black Activator hi-tops ordered by Walmart. An opinion filed in the United States District Court for the Central District of California supports further inquiry into the claim that the 52806 product number was exclusive to Walmart. *See L.A. Gear, Inc. v. E.S. Originals, Inc.,* 859 F. Supp. 1294 (C.D. Cal. 1994). The *L.A. Gear* opinion grating Voit's motion for summary judgment in a patent infringement case found that E.S. Originals, Inc., pursuant to a license agreement with Voit, manufactured and distributed Voit shoes to multiple retailers, including Walmart, Dayton Hudson Corp., and Montgomery Ward & Co., Inc. during the time period between 1989 and 1993. *Id.* at 1296. If the Court considering the facts before it in *L.A. Gear* case determined that E.S. Originals, Inc. sold Voit shoes to multiple retailers, the Asma memo's claim of Walmart's exclusivity as to the product number 52806 is called into question.

In summary, neither the Asma memo, nor the documents attached to the Response, establish that the Voit shoes were not available for purchase at the time of the murder. Accordingly, Plaintiff's argument for destructive testing is at a minimum, premature.

9

Plaintiff's Own Retained Lab Was in Possession of the Crime Scene Evidence in 1993

The Response does not mention that all physical evidence in the possession of NIRCL and ISP was released to Plaintiff's retained lab, SRI, in 1993. Attached to this Reply is a March 25, 1993 Order entered by the Lake County Circuit Court authorizing Plaintiff to have the crime scene evidence tested at SRI. (Ex. 5) On April 22, 1993, SRI sent David Asma a letter enclosing photographs of the Voit shoes in SRI's possession at its Richmond, California lab. (See Ex. 6) Ultimately, SRI's Brian Wraxall produced a September 13, 1993 report listing the results of his testing of the crime scene evidence on Plaintiff's behalf, including his testing of the Voit shoes. (See Ex. 7) At page two of that report, Wraxall states that he was unable to detect DNA on the shoes or the packets that contained the thread stains tested by ISP. *Id.* Further, Wraxall was unable to determine if the blood smears on the shoes were human in origin. *Id.*

Plaintiff's Response now takes the position that the Officer Defendants' contact with the shoes leads to the conclusion that only they could have placed DNA on the shoes or in the paper packets that once contained the blood stains. However, this argument ignores the fact that the shoes were in in the possession of David Howard from the time he apparently obtained them from Plaintiff in Hill Correctional Center until the time investigators recovered them on November 23, 1992. Further, it is now clear that the shoes and the paper packets were in the possession of Plaintiff's experts in 1993 along with all of the other crime scene evidence. Thus, there exists more than one explanation as to how Unknown Male #1's DNA could have appeared on the Voit Shoes, even assuming *arguendo* that the shoes were not available for purchase at the time of the murder. Considered in this light, Plaintiff's argument for destructive testing of the Voit shoes and related materials is even less justifiable.

ISP Has Definitively Told Plaintiff That It Has No Voit Shoe Related Materials

Plaintiff's elaborate, albeit unscientific, explanation as to why he needs the shoes and related materials for testing is based, in part, upon the argument that the materials in the possession of NIRCL must be tested in conjunction with materials allegedly in the possession of ISP to demonstrate the exact moment in time the DNA was placed on the shoes. However, Plaintiff sent a November 3, 2014 subpoena to ISP demanding production of the Voit shoe related testing materials and was definitively told by ISP that "none of the subpoenaed materials are currently in its possession." (See Ex. 8) It is unclear why Plaintiff's Response claims his counsel is in talks with ISP regarding production of the non-existent materials previously subpoenaed. Even if Plaintiff did have a viable claim that simultaneously testing the NIRCL and ISP materials would allow him to develop some probative evidence, ISP's subpoena response has foreclosed that as a possibility.

Denial of Testing Does Not Prejudice Plaintiff's Claims but Granting Plaintiff the Right to Destructively Test Prejudices Waukegan Greatly

A review of Plaintiff's Response makes clear that he will not be prejudiced by an order granting Waukegan's Motion to Quash the Subpoena to NIRCL. The testing sought by Plaintiff is not reasonable, necessary, or even capable of supporting his planting of blood evidence theory. Even without testing, Plaintiff is free to pursue his planting theory by attempting to establish that David Asma's hearsay laden memo can be substantiated. On the other hand, Plaintiff concedes that testing will destroy all the remaining DNA of Unknown Male #1. Allowing Plaintiff to destroy this DNA in support of his claims in this Court may compromise an ongoing investigation and deprive a future criminal defendant of testing in support of a criminal defense in a capital case. There is no reasonable safeguard that may be put in place to protect against the irreparable harm that this may inflict on a future prosecution for the murder of Holly Staker.

For the foregoing reasons, the City of Waukegan respectfully requests that this Court grant its Motion to Quash Plaintiff's November 19, 2014 Subpoena to Northeastern Illinois Regional Crime Laboratory.

                                              RESPECTFULLY SUBMITTED,

                                              /s/ Michael D. Furlong
                                              Michael D. Furlong

Peter M. Trobe (Atty. No. 2857863)
Michael D. Furlong (Atty. No. 6289523)
TROBE, BABOWICE & ASSOCIATES, LLC
404 West Water Street
Waukegan, Illinois 60085
Tel: (847) 625-8700
Fax (847-625-8708
ptrobe@tbalaws.com
mfurlong@tbalaws.com

**CERTIFICATE OF SERVICE**

      I, Michael D. Furlong, certify that on December 19, 2014, I electronically filed the with the Clerk of the Court using the Electronic Case Filing System the foregoing **REPLY IN SUPPORT OF CITY OF WAUKEGAN'S MOTION TO QUASH PLAINTIFF'S NOVMEBER 19, 2014 SUBPOENA TO NORTHEASTERN ILLINIOS REGIONAL CRIME LABORATORY**, which will send notification of such filing to all counsel of record registered on the CM/ECF system.

                                              /s/ Michael D. Furlong